# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Earl Hutz,                                        :
                         Petitioner               :
                                                  :
           v.                                     :   No. 2140 C.D. 2015
                                                  :   Submitted: April 22, 2016
Workers' Compensation Appeal                      :
Board (City of Philadelphia),                     :
                         Respondent               :


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION**
**BY JUDGE SIMPSON**              **FILED: September 7, 2016**


This workers' compensation appeal involves cancer contracted by a Philadelphia firefighter. In particular, Earl Hutz (Claimant) petitions for review of an order of the Workers' Compensation Appeal Board (Board) affirming a decision of a Workers' Compensation Judge (WCJ). The WCJ denied a claim petition seeking total disability benefits under Section 108(r) of the Workers' Compensation Act (Act)[1] for prostate cancer he allegedly contracted as a result of exposure to carcinogens as a firefighter for the City of Philadelphia (Employer). Claimant contends the decisions of the WCJ and Board are unsupported by

---

[1] Act of June 2, 1915, P.L. 736, as amended, added by the Act of December 6, 1972, P.L. 930, 77 P.S. §27.1(r). Section 301(c)(2) of the Act, 77 P.S. §411(2), provides that the term "injury" as used in the Act shall include an "occupational disease" as defined in Section 108 of the Act. The Act of July 27, 2011, P.L. 251, commonly known as Act 46, amended Section 108 to include: "(r) Cancer suffered by a firefighter which is caused by exposure to a known carcinogen which is recognized as a Group 1 carcinogen by the International Agency for Research on Cancer." 77 P.S. §27.1(r).

competent evidence and inconsistent with the applicable case law. Respectful of Claimant's contribution to public safety, we nevertheless are compelled to affirm.

## I. Background

### A. Petitions

In April 2012, Claimant filed a claim petition alleging his prostate cancer resulted from direct exposure to IARC (International Agency for Research on Cancer) Group I carcinogens while working as a firefighter for the City of Philadelphia (Employer). Claimant sought total disability benefits for the closed period of March 13, 2006 to June 5, 2006. Employer filed a timely answer denying Claimant's material allegations.

In October 2012, Claimant filed a penalty petition alleging Employer violated 34 Pa. Code §131.61 (relating to exchange of information) by failing to provide discoverable material that Claimant requested. Employer filed a timely answer denying Claimant's material allegations.

### B. Evidence

In his decision, the WCJ summarized the evidence submitted by the parties. Claimant, 65 years old at the time of his deposition, testified he began working for Employer as a firefighter in 1974. Prior to that, he had no history of cancer. After starting as a firefighter, Claimant received promotions to lieutenant and then captain. Claimant had eight physicals prior to being diagnosed with prostate cancer in 2006. WCJ's Op., 9/9/14, at Finding of Fact (F.F.) No. 1a.

2

In February 2006, Claimant underwent a biopsy, which resulted in a diagnosis of prostate cancer. In March 2006, Claimant's doctors performed a radical prostatectomy. For eight weeks following surgery, Claimant had radiation treatments. Claimant missed approximately three months of work. Claimant finished his career as a captain when he retired in January 2008; his firefighting career spanned 33 years. F.F. No. 1i.

During his career, Claimant worked at a number of different fire stations. At each station, Claimant was exposed to diesel fuel emissions. At the beginning of every shift, the firefighters started their truck engines to check the pumps. Each apparatus usually ran for 10 to 15 minutes. As an officer, Claimant coordinated this activity. Although the garage doors were opened, this did not take out all diesel fuel emissions. Claimant observed soot on the walls of every firehouse. The walls were scrubbed every two weeks. F.F. No. 1b.

During his career, Claimant fought approximately 100 fires, of all types, per year. These included structure fires, rubbish fires, vehicle fires, refinery fires and grass fires. A structure fire has different phases, including fire suppression, rescue and ventilation. Once the fire is out, overhaul is done to make sure there are no hidden fires. In an overhaul, the walls and the ceiling are pulled down to look for hidden fires. Later in the process, the firefighters remove as much burned material as possible. Smoke and gas from incomplete combustion are present in the structure during the overhaul process. F.F. Nos. 1e, g.

The firefighters also encounter smoke at exterior fires. These include car fires, rubbish fires, dumpster fires and grass fires. F.F. No. 1e.

During the last eight years of his career, Claimant used a self-contained breathing apparatus (SCBA) while fighting a fire inside a building. Prior to that, firefighters did not have a SCBA. After fighting a fire, Claimant had soot in his nose, on his clothes and even in his hair despite wearing a helmet. For days after a fire, Claimant would blow soot out of his nose. F.F. Nos. 1f, g.

At the beginning of his career, Employer provided Claimant with protective equipment including a helmet, coat, boots and gloves. In 1992, Employer provided Claimant with full bunker gear, including a helmet, coat, gloves, shorter boots and bunker pants. Claimant also received a protective hood to wear under his helmet. However, Claimant cleaned his own gear. When handling his gear, Claimant got soot all over his hands and shirt. F.F. No. 1h.

Claimant also encountered asbestos during his career. In the first four or five firehouses where he worked, asbestos was flaking off the pipes. It became a big issue and Employer removed or covered it. Claimant also fought fires and participated in overhauling older buildings with asbestos. During an overhaul, Claimant pulled out walls and ceilings containing asbestos. F.F. No. 1m.

In addition, Claimant testified he was probably exposed to poly-chlorinated biphenyls (PCBs) during telephone pole fires. In February 1990,

Claimant was hospitalized for two days after fighting a fire in an air conditioning unit containing Freon. F.F. No. 1m.

Prior to his cancer diagnosis in February 2006, Claimant enjoyed a healthy lifestyle, which included playing tennis. For the last 20 years, Claimant walked every day and jogged for about 10 minutes. Claimant started to drink alcohol between the ages of 45 and 50. Claimant will drink a few beers while out socially, but he does not drink hard liquor. Claimant eats mostly chicken, but he will occasionally eat red meat. F.F. No. 1n.

Claimant had no family history of prostate cancer. However, his father passed away from colon cancer and his brother is in remission from lymphoma. In addition, his mother was recently diagnosed with throat cancer. F.F. No. 1k.

Claimant never smoked. Although his wife is a smoker, she does not smoke in the house or in the car while Claimant is present. However, Claimant's co-workers regularly smoked at the kitchen table in the fire station. During the last three or four years of Claimant's career, Employer adopted a policy of no smoking inside buildings. F.F. No. 1k.

As noted above, Claimant underwent a radical prostatectomy in March 2006. Dr. Cadence Kim, and her partner, Dr. David Kraman, both urologists, performed the surgery. Claimant missed three months of work following the surgery. F.F. No. 1i.

On cross-examination, Claimant testified he became aware that his prostate cancer might be work-related in 2011 when he read in his union's magazine about a change in the law regarding cancer and firefighters. Claimant then contacted an attorney and signed a fee agreement in September 2011. When he hired his attorney Claimant became aware there was a legal presumption that his cancer was work-related. Claimant never returned to work after leaving Employer's Fire Department. F.F. No. 1o.

Claimant also submitted medical reports from Dr. Virginia Weaver, a physician board certified in internal medicine and occupational medicine. Dr. Weaver is licensed in Maryland, an associate professor at Johns Hopkins University and a member of the Medical Advisory Board of the International Association of Firefighters. Dr. Weaver testified before legislative committees in Virginia, Colorado and Maine regarding firefighter cancer presumption statutes. F.F. No. 2a.

Dr. Weaver stated that medical data clearly show that a wide range of chemicals, classified as known or probable human carcinogens by IARC, were found in smoke from burning structures, including buildings and automobiles. Further, although firefighters use protective equipment, the degree of protection is nevertheless incomplete. Firefighters routinely observe black soot on their skin and in nasal discharges after major fires. F.F. No. 2b.

In addition, until recently, most firefighters routinely removed their respiratory protection during the overhaul process, which resulted in carcinogen

exposures. Also, firefighters have been exposed to diesel exhaust in fire stations for many years. Recent Studies by the National Cancer Institute and the National Institute for Occupational Safety and Health provide additional data supporting the carcinogenicity of diesel exhaust. In conclusion, Dr. Weaver opined, within a reasonable degree of medical certainty, that firefighters are exposed to IARC Group 1 carcinogens in the course of their work. F.F. No. 2b.

Claimant also presented the December 2012 and January 2013 deposition testimony of Dr. Barry L. Singer (Claimant's Expert), a physician board certified in internal medicine, hematology and medical oncology. In these depositions, Claimant's Expert testified on the issue of methodology. On average, as an oncologist, Claimant's Expert sees 60 patients per week. In a typical week, Claimant's Expert does not see a patient with prostate cancer. Breast, colon and lung cancer patients make up 90 percent of his practice. F.F. No. 3a.

Claimant's Expert is not a toxicologist or epidemiologist; he has not designed a study protocol or published anything on the etiology (causes or causation) of cancer. In particular, Claimant's Expert never performed any research on the etiology of prostate cancer. Rather, Claimant's Expert's focus has been on patient care. F.F. No. 3a.

In the present case, Claimant's attorney sought Claimant's Expert's opinion on the issue of the role that firefighting played in the development of cancer in 40 to 50 cases. In forming his opinions, Claimant's Expert considered a 2006 epidemiologic study performed by Dr. Grace LeMasters, an IARC single-

subject study dealing with firefighters, a study from the Institute of Occupational Medicine (IOM), and reports from, Employer's medical expert, Dr. Tee L. Guidotti, and Dr. Weaver.  F.F. No. 3b.

Claimant's Expert also reviewed the treatment records of and an affidavit by each firefighter regarding occupational history and exposure. Claimant's Expert noted that many firefighters did not wear their SCBA during fire suppression and overhaul.  F.F. No. 3c.

Claimant's Expert's method is differential diagnosis, which involves listing all possibilities in terms of diseases and causes, and then eliminating causes until a *final* or *most probable* diagnosis is reached.  He used this method when treating his patients and doing medical-legal work.  Claimant's Expert's opinion is based on the epidemiologic studies including the IARC and IOM studies, and the firefighters' affidavits and medical records.  F.F. No. 3d.

Based on the studies, Claimant's Expert found that firefighters are exposed to various carcinogens, such as diesel fumes, smoke and soot.  When fighting fires, firefighters are exposed to partially burned plastics and wood, polycylic aromatic hydrocarbons (PAHs), PCBs, arsenic, benzene and other Group I and Group IIA carcinogens.  To that end, fire smoke is made up of soot and partially burned materials, organic and inorganic.  Further, based on a study by the California Environmental Protection Agency, Claimant's Expert noted that diesel fuel emissions contain the carcinogens benzene, arsenic, formaldehyde and nickel. F.F. No. 3d.

8

Claimant's Expert offered opinions about the relationship between firefighting and cancer in 40 cases brought by Claimant's attorney. Ultimately, Claimant's Expert asserted that 15 or 16 different types of cancer result from firefighting exposure. However, Claimant's Expert was not the treating physician for any of the firefighters involved in these cases. In fact, Claimant's Expert only interviewed or examined one or two of the firefighters, and he did not consult with their treating oncologists. In addition, Claimant's Expert did not visit any fire stations in Philadelphia. F.F. Nos. 3h, i.

Claimant's Expert also agreed that most firefighters did not get cancer and that some firefighters got cancer for reasons unrelated to their job. Each firefighter has his or her immune system; some firefighters with the same exposure to carcinogens may get cancer while others may not. F.F. Nos. 3j.

Claimant's Expert also recognized that the risk of certain cancers increased in firefighters not so much by exposure to particular agents, but rather by a constellation of exposures mixed together. In other words, the elements are synergistic, such as asbestos and smoking, and the likelihood is that other combinations of carcinogens are also synergistic. Because every fire is different, there is no way to determine when and how much a firefighter is exposed to any particular carcinogen. What is more, Claimant's Expert agreed that in 70% of all cancers, a precise etiology, or cause, could not be pinpointed. F.F. No. 3k.

However, Claimant's Expert observed that 60 of the approximately 120 IARC Group I carcinogens are contained in cigarette smoke. Further, cigarette

9

smoke is responsible for at least 70% of all cancers in the United States. Thus, the fact that a firefighter smoked would not negate the impact of his exposure to other carcinogens, but would be synergistic in adding to that exposure. F.F. No. 3k.

Claimant's Expert also acknowledged that the existing literature on firefighters and cancer followed only a small group of firefighters and failed to identify dose-response relationships. F.F. No. 3l. In addition, Claimant's Expert agreed with a 2009 report by the National League of Cities on Firefighting and Cancer, that one out of every two Americans will be diagnosed with cancer at some point. Id.

Claimant also submitted his Expert's January 28, 2013 deposition with regard to Philadelphia firefighters with prostate cancer. Claimant's Expert evaluated and issued reports on approximately 25 firefighters with prostate cancer. F.F. No. 4a. He evaluated three or four other cases in which he did not file a report. Id.

The main risk factors for prostate cancer are age, race, and family history of prostate cancer. F.F. No. 4b. Claimant's Expert weighed each firefighter's exposure history against his age and family history. Id. The median age in the United States for diagnosis of prostate cancer is 67. Id. Claimant's Expert named arsenic, cadmium, and PAHs, including dioxin, as the carcinogens related to prostate cancer. Id.

Based on several studies he identified, Claimant's Expert opined that exposure to carcinogens while firefighting constituted a contributing factor to the firefighters' prostate cancer. F.F. No. 4b. However, Claimant's Expert did not opine that workplace exposure to carcinogens constituted the only cause. Id. Although these firefighters may have developed prostate cancer later, Claimant's Expert opined that exposure to carcinogens caused their cancer to appear earlier. Id.

Further, Claimant's Expert did not believe the increase in prostate cancer among Philadelphia firefighters resulted from a detection bias based on better PSA (prostate specific antigen) screening. F.F. No. 4c. He explained that PSA screening did not widely begin until the early 1990s. Id. Here, the majority of the studies involved diagnoses which occurred before that time. Id. Nonetheless, Claimant's Expert acknowledged the diagnosis age for prostate cancer fell after the advent of PSA testing. Id.

On cross examination, Claimant's Expert acknowledged that the Center for Disease Control (CDC) and other sources identify race, family history and age as the most common risk factors for prostate cancer. F.F. No. 5d. Claimant's Expert agreed with the CDC that half of all men will have prostate cancer at death, that 20% of all men will be diagnosed with prostate cancer during their lifetime, and that prostate cancer is the leading cancer among men. Id.

11

Claimant's Expert also acknowledged a number of flaws in the studies he cited in reaching his opinions. F.F. No. 4e. For example, none of the studies he reviewed were controlled for smoking. Id.

Further, Claimant's Expert admitted he was unaware that the Pennsylvania Department of Health concluded that simply living in Philadelphia, as the only controlled criteria, increased the risk of prostate cancer by 40.6%. F.F. No. 4f. In addition, Claimant's Expert did not study the Philadelphia population as to diet, environmental exposures, ethnic heritage, geography or proximity to toxic waste sites. Id.

Nevertheless, despite the many non-work related risk factors, including age, family history and other environmental exposures to carcinogens, Claimant's Expert opined that exposure during employment as a firefighter was a contributing factor to the early development of prostate cancer in all but one of the cases. F.F. No. 4g.

In addition, Claimant's Expert reviewed Claimant's affidavit and his medical records pertaining to his diagnosis of prostate cancer, his surgery, and radiation therapy. F.F. No. 5a. Claimant's Expert reviewed Claimant's 33-year work history and opined that Claimant was exposed to various IARC Group 1 carcinogens commonly found in smoke, including arsenic, asbestos, benzene, benzo(a)pyrene, 1,3 butadiene, formaldehyde and soot. F.F. No. 5e. In an April 11, 2012 report, Claimant's Expert opined, within a reasonable degree of medical certainty, that Claimant's exposure to carcinogens while working for the City of

12

Philadelphia as a firefighter constituted a substantial contributing factor in the development of his prostate cancer. F.F. No. 5g. Claimant's Expert further opined, within a reasonable degree of medical certainty, that all care rendered to Claimant for his prostate cancer was appropriate and necessary, and within accepted medical standards for his diagnosis. Id.

In response to Claimant's evidence, Employer submitted the deposition testimony of Dr. Tee L. Guidotti (Employer's Expert), a physician board certified in internal medicine, pulmonary medicine and occupational medicine. F.F. No. 6a. Employer's Expert is also trained in epidemiology, which is the science of methodology addressing how risk factors match up with disease patterns. Id. He also has training in toxicology as part of his background in occupational medicine. Id.

Moreover, Employer's Expert organized studies and testified before Congress, the Department of Justice and the U.S. Navy on the specific issues of firefighters' exposure to carcinogens, and their potential relationship to cancer. F.F. No. 6a. Employer's Expert stated that Claimant's Expert is an oncologist; his expertise focuses on the detection and treatment of cancer, not the cause of cancer. Id. Further, Employer's Expert found nothing in Claimant's Expert's work suggestive of expertise in causation or etiology. Id.

Employer's Expert explained that epidemiology addresses general causation, or something that can cause an outcome. F.F. No. 6b. The scientific literature discusses the strength of the causal relationship and toxicological

13

information explains why the relationship appears probable.  Id.  Further, specific causation relates to the individual case.  Id.

After reviewing Claimant's Expert's testimony, Employer's Expert opined that Claimant's Expert had no particular expertise on how the studies proved general causation.  F.F. No. 6b.  Without knowledge of statistics or how the scientists treated the numbers, Claimant's Expert could not know the strengths and weaknesses of the studies.  Id.  Further, Employer's Expert opined that Claimant's Expert's counting the number of studies supporting a proposition and the number of studies that did not support it, is not an appropriate method for reviewing epidemiological literature.  Id.

Also, Employer's Expert opined, Claimant's Expert's reliance on meta-analysis did not overcome his lack of expertise in epidemiology and statistics.  F.F. No. 6b.  A meta-analysis is an interpretive tool, but it does not summarize all the studies in a meaningful sense, and it does not report on the nuance or bias of a given study.  Id.  In addition, Claimant's Expert lacked knowledge of the Bradford Hill criteria, which are universally used in epidemiological research to indicate whether a collected body of evidence pointed in the direction of causation.  Id.  Claimant's Expert's lack of knowledge of the Bradford Hill criteria indicated his unfamiliarity with mainstream epidemiologic methodology.  Id.

What is more, Employer's Expert pointed out significant flaws in several of the studies cited by Claimant's Expert.  F.F. No. 6c.  Employer's Expert

noted Claimant's Expert's unfamiliarity with the concept of statistical significance with respect to interpreting a study. Id. Employer's Expert opined "[a]n individual who did not know this concept would be very limited in [his] ability to interpret studies." Id.

Employer's Expert also criticized Claimant's Expert's reports regarding the Philadelphia firefighters. F.F. No. 6d. Employer's Expert could not discern any methodology used by Claimant's Expert. Id. Rather, it appeared Claimant's Expert rubber stamped the language of the studies without any weighing of the evidence or discussion of the individual studies. Id.

Additionally, Employer's Expert found other problems with Claimant's Expert's reports and opinions. F.F. No. 6e. Claimant's Expert's understanding of the nature of the exposure was limited to the information contained in the firefighters' affidavits; he did not discuss the existence of other risk factors that could have played a role in the development of cancer such as diet and smoking history. Id. Also, although Claimant's Expert alluded to several Group 1 carcinogens, he did not match a specific carcinogen to a specific type of cancer. Id.

Thus, based on the foregoing, Employer's Expert opined Claimant's Expert's opinion did not conform to usual standards for the formation of a general causation opinion. F.F. No. 6f. In the absence of general causation, Employer's Expert continued, any inquiry about specific causation must be ended. Id.

15

Employer's Expert also testified regarding the specific issue of prostate cancer. F.F. No. 7a. Age is the primary risk factor for prostate cancer. Id. During the late 40s and early 50s, the risk increases and accelerates quickly. Id. Family history is the next risk factor. Id. An individual with a male parent with prostate cancer is a first-degree risk. Id. If several men in the family have prostate cancer, it suggests the gene is running in the family. Id.

Prostate cancer is not commonly attributable to occupational exposures. F.F. No. 7a. It is the leading type of cancer among men and at least 20 percent of all men will be diagnosed with it at some point in their lifetime. Id.

Employer also submitted a March 2013 report from Janet L. Stanford, Ph.D. See F.F. No. 9. Dr. Stanford is a former Head of the Prostate Cancer Research Program at the Fred Hutchinson Cancer Research Center in Seattle, Washington. Id. Dr. Stanford is also a research professor in the Epidemiology Department, and an adjunct research professor in the Urology Department at the University of Washington. Id.

Dr. Stanford opined that epidemiological studies are based on observational data as opposed to a randomized trial. F.F. No. 9b. The analyses are designed to determine whether there is evidence of an association between a specific exposure and a disease status. Id. An association does not mean causation. Id. Causation is difficult to prove in the absence of a randomized trial where individuals could be assigned to an exposure over time and an assessment could be made as to the exposure's effect on disease incidence among them. Id.

16

Further, Dr. Stanford opined, based on public studies, it is possible to estimate the likelihood that an exposure may be associated with a disease such as prostate cancer, but it is not possible to prove causality. F.F. No. 9d. For complex diseases such as prostate cancer, there are most likely multiple genes and multiple environmental/lifestyle exposures that contribute to causation. Id.

In rebuttal to Employer's evidence, Claimant submitted a 2012 report from Grace K. LeMasters, Ph.D., a professor of epidemiology and biostatistics in the Department of Environmental Health at the University of Cincinnati College of Medicine. F.F. No. 10a. Dr. LeMasters opined that Employer's Expert did not take into account recent scientific articles about firefighters' exposure to carcinogens and the possible effects on reproductive organs in general and prostate cancer in particular. Id. She further opined that PSA detection bias cannot explain the increased risk estimate for firefighters because the studies were completed before PSA testing became widely used. Id.

Dr. LeMasters also stated that the IARC rated the overall job of firefighting as possibly carcinogenic to humans. F.F. No. 10b. The IARC indicated that firefighters have a 50% higher incidence of testicular cancer, a 30% higher incidence of prostate cancer, and a 20% higher incidence of non-Hodgkin lymphoma. Id.

In addition, Dr. LeMasters stated that a recent study by Underwriters Laboratories, in partnership with the Chicago Fire Department and the University of Cincinnati, found firefighters' clothing to be contaminated with many metals,

17

including chromium, copper, arsenic, strontium and cobalt. F.F. No. 10c. This study also concluded that firefighters' smoke exposures repeatedly exceeded recommended exposure limits. Id. Further, chemicals such as phthalate ester di-2-ethylhexylphthalate and PAHs, were found on the gloves and hoods of firefighters. Id. These chemicals may be absorbed by the lungs in a vapor state from inhaled particles or by the skin from smoke deposits on skin and clothing. Id.

Dr. LeMasters further stated that her 2006 meta-analysis and a repeat analysis by the IARC in 2010 revealed that testicular and prostate cancers were the top two solid tissue cancers in firefighters. F.F. No. 10d. Similar studies suggest that phthalate di-esters, used in many household plastics and commonly found at fires, are endocrine disrupters. Id. A suspected mechanism of prostate cancer in firefighters is high exposure to phthalate di-esters, which increase oxidative stress and can result in tissue damage, mutations and progression to malignancy in prostate cells. Id.

In sum, Dr. LeMasters opined that firefighters are exposed to the following Group 1 carcinogens:

> 1. Arsenic and cadmium from overhaul and fires in old buildings;
> 2. Benzene in almost all fires with wood structures, mixed occupancy buildings, electronics and grasslands;
> 3. Diesel exhaust in trucks in the firehouse and at fires;
> 4. Formaldehyde in burning textiles and particle board;
> 5. Vinyl chloride in components of plastics, metals, insulation and packing; and
> 6. Soot in all fires during incomplete combustion.

F.F. No. 10e.

Summarizing, Dr. LeMasters reiterated that her 2006 studies and the IARC's 2010 studies consistently showed a 30% increased risk of prostate cancer in firefighters. F.F. No. 10f. Ultimately, Dr. LeMasters opined, within a reasonable degree of scientific certainty, that firefighter exposures are, at a minimum, a substantial contributing factor in the development of prostate cancer. Id.

### C. WCJ's Critical Findings

In reviewing the evidence, the WCJ found Claimant's testimony credible as to his work history. F.F. No. 13. The WCJ also credited the testimony of Claimant's Expert, and the reports of Drs. Weaver and LeMasters, to the extent they established that Claimant was exposed to IARC Group 1 carcinogens during his career as a firefighter. Id. On that issue, the WCJ observed, Employer failed to present any contrary evidence. Id.

However, the WCJ found that Claimant's Expert's testimony failed to credibly or persuasively establish that exposures to Group 1 carcinogens were a significant contributing factor to the cause of Claimant's prostate cancer. F.F. No. 14. The WCJ provided several reasons for rejecting Claimant's Expert's testimony as to causation. Id. First, Claimant's Expert never designed a study protocol and he never published on the etiology of cancer or on firefighters specifically. F.F. No. 14a. In particular, he never performed any research on the etiology of prostate cancer. Id.

19

Further, Claimant's Expert did not know the methodologies various groups, including the Environmental Protection Agency (EPA), the Veterans Administration, the IARC, the National Academy of Sciences, the American Medical Association, and the federal courts, used in attempting to link a given exposure to a given cancer. F.F. No. 14b. In addition, Claimant's Expert could not cite any authority for his assertion that the differential diagnosis methodology he used is the accepted methodology for determining a potential causative relationship between a given carcinogen and a given cancer. F.F. No. 14c.

The WCJ also noted Claimant's Expert is not an epidemiologist and that he could not assess reliability based on study design. F.F. No. 14d. Claimant's Expert was unfamiliar with the Bradford Hill criteria used in epidemiological research to determine a cause-and-effect relationship between a particular agent and the development of a disease, as explained by Employer's Expert. Id. Furthermore, Claimant's Expert is not a statistician and did not know how statistical significance is calculated. Id. He did not address the biostatistical methods and analytic techniques used in the studies he reviewed. Id.

Claimant's Expert also agreed that Dr. LeMasters' study did not address the issue of dose response, and he acknowledged he was unaware that the 28% increase of prostate cancer among firefighters, cited by Dr. LeMasters, was lower than the percentage usually attributed to detection bias. F.F. No. 14d. Claimant's Expert further acknowledged problems with two other studies he relied on (Samet Study and Bates Study); he also agreed that none of the studies he reviewed were controlled for smoking. Id.

20

In addition, the WCJ observed, Claimant's Expert agreed that the CDC and other sources indicate that the most common risk factors for prostate cancer are race, family history and age. F.F. No. 14e.

Finally, the WCJ noted that Claimant's Expert never treated or examined Claimant. F.F. No. 14f. What is more, Claimant's medical records only went back to 2006. Id. Claimant's Expert also agreed that Claimant's reports did not mention potential causes other than firefighting that contributed to the development of Claimant's cancer, including potential exposures at his second job, his ethnic background, diet, geography and possible exposures during military service. Id.

In his last finding, the WCJ accepted as credible and persuasive Employer's Expert's testimony that Claimant's Expert's opinions did not conform to the usual epidemiologic standards for the formation of a general causation opinion. F.F. No. 15. Employer's Expert also credibly and persuasively explained that any elevated risk for prostate cancer among firefighters might also be explained by other factors, such as PSA detection bias, ethnicity and geography. Id. Lastly, the WCJ found Dr. Stanford credibly explained that prostate cancer is a complex disease in which multiple factors contributed to causation. Id. To that end, Dr. Stanford indicated, the interaction between genetic factors and environmental or lifestyle factors has not been properly studied due to the large sample sizes needed for proper assessment. Id.

## D. WCJ's Conclusions

The WCJ first noted Claimant filed his occupational disease claim pursuant to Section 108(r), which provides for a rebuttable presumption of *compensability* specifically for firefighters who suffer from cancer caused by a direct exposure to an IARC Group 1 carcinogen. Conclusion of Law (C.L.) No. 2. To be entitled to this presumption, the WCJ reasoned, a claimant must show, in accord with Section 301(e) of the Act (relating to a rebuttable presumption of *causation* regarding occupational diseases generally), that he was employed as a firefighter at or immediately before the date of disability. Id. On this basis, the WCJ determined the presumption of compensability afforded to firefighters by 301(f) did not apply in this case. Id. As such, the WCJ reasoned the case must be decided on general causation principles. Id.

As discussed below, the Board determined the WCJ misapprehended some of the facts in this case and incorrectly determined Claimant retired prior to his cancer diagnosis. The Board affirmed the inapplicability of the Section 301(f) presumption on a different basis.

Ultimately, the WCJ determined the credible evidence did not establish that Claimant's employment as a firefighter caused his prostate cancer. C.L. No. 2. Therefore, the WCJ also determined Claimant did not prove disability for the dates alleged in his claim petition. Id. Thus, even assuming the presumption of compensability applied, the WCJ determined Employer rebutted it with substantial competent evidence. C.L. No. 3. Consequently, the WCJ denied Claimant's claim petition.

22

The WCJ also determined Claimant failed to establish Employer violated any provision of the Act.  C.L. No. 4.  Therefore, the WCJ denied Claimant's penalty petition.

### E. Board Decision

In affirming the WCJ on different grounds, the Board reasoned (with emphasis added):

> It is undisputed that Claimant was diagnosed with prostate cancer.  There is no apparent dispute that Claimant served over 4 continuous years as a firefighter or that he successfully passed a physical examination prior to engaging in firefighter duties.  Further, [Employer] does not challenge the WCJ's findings that Claimant was exposed to Group 1 carcinogens throughout his career.  The WCJ, however, found that Claimant retired prior to his diagnosis and could not benefit from a causation presumption as per Section 301(e), because he was not employed at or immediately before his alleged date of disability.  Claimant, however, credibly testified that he was diagnosed with prostate cancer in January, 2006 and missed 3 months of work due to treatment.  Further, his testimony establishes that he did not retire until January 4, 2008.  The WCJ therefore erred in his assessment of these facts.

Bd. Op., 10/21/15, at 14-15.

The Board further recognized that under Section 301(f) of the Act,[2] claims may be filed under Section 108(r) within 600 weeks after the last date of employment with exposure to the hazard.  Bd. Op. at 15.  The Board also observed

---

[2] Added by the Act of July 7, 2011, P.L. 251, 77 P.S. §414.

that in accord with the last sentence in Section 301(f), the presumption of compensability afforded firefighters with work-related cancer applies only to claims made within 300 weeks of the last date of employment with exposure to the hazard. 77 P.S. §414.

Here, however, Claimant filed his claim petition in April 2012, approximately 318 weeks after his last date of exposure prior to his prostatectomy. Consequently, the Board determined Section 301(f)'s presumption did not apply in this case. Bd. Op. at 15.

Therefore, the Board explained, Claimant bore the burden of establishing all elements necessary to support an award. Inglis House v. Workmen's Comp. Appeal Bd. (Reedy), 634 A.2d 592 (Pa. 1993). Where the causal connection between the work injury and disability is not obvious, the relationship must be established by unequivocal medical testimony. Fotta v. Workmen's Comp. Appeal Bd. (U.S. Steel/USX Corp. Maple Creek Mine), 626 A.2d 1144 (Pa. 1993). Further, when a medical expert opines that both work-related and non-work-related factors are causes of an alleged work injury in the nature of an occupational disease, in addition to establishing workplace exposure, a claimant must prove that the work-related cause constituted a substantial contributing factor in the development of the disease. Pawlosky v. Workmen's Comp. Appeal Bd. (Latrobe Brewing Co.), 525 A.2d 1204 (Pa. Cmwlth. 1987).

Here, the Board noted, the WCJ rejected Claimant's Expert's testimony that Claimant's occupational exposure to Group 1 carcinogens was a

24

substantial contributing factor in the development of his prostate cancer. Bd. Op. at 16. The Board also observed that the WCJ's determinations regarding Claimant's Expert's qualifications were consistent with the doctor's acknowledgement that he is not an epidemiologist, never engaged in research or published any articles on the etiology of cancer, and that he could not testify as to the reliability of the studies on which he relied. Id.

In sum, the Board recognized that Claimant's challenges on appeal centered on the WCJ's acceptance of Employer's experts' opinions. Bd. Op. at 17. Because the WCJ rejected Claimant's Expert's opinions as to causation, the Board noted Employer bore no rebuttal burden. Bd. Op. at 16, n.6. Claimant petitions for review.[3]

## II. Issues

Claimant presents three primary issues for our review. First, Claimant contends the Board erred in misinterpreting Section 301(f) of the Act as requiring that a firefighter must file a claim petition within 300 weeks of his last occupational exposure in order for the rebuttable presumption of compensability to apply. Second, Claimant asserts, even assuming Section 301(f) creates a limitation on the time in which a firefighter diagnosed with cancer has to file a claim petition, the discovery rule applies and therefore extends the time for filing. Third, Claimant maintains the Board's alternative determination that Employer rebutted

---

[3] Our review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. Phoenixville Hosp. v. Workers' Comp. Appeal Bd. (Shoap), 81 A.3d 830 (Pa. 2013).

the statutory presumption of compensability in Section 301(f) is not supported by competent evidence or pertinent legal authority.

In addition, Employer, citing its appeal in <u>City of Philadelphia Fire Department v. Workers' Compensation Appeal Board (Sladek)</u>, ___ A.3d ___, (Pa. Cmwlth., No. 579 C.D. 2015, filed August 12, 2016) (*en banc*), argues the proper interpretation of the language "[c]ancer suffered by a firefighter which is caused by exposure to a known carcinogen which is recognized as Group 1 by the [IARC]" in Section 108(r) requires that a firefighter prove an occupational exposure to a carcinogen linked to the development of the cancer at issue in order to be entitled to the presumption of compensability in Section 301(f) of the Act.

### III. Discussion

### A. Relevant Statutory Provisions; <u>Sladek</u>

To begin, we note Section 301(c) of the Act, as amended by Act 46, pertinently provides (with emphasis added):

> (1) The terms 'injury' and 'personal injury,' as used in this act, shall be construed to mean an injury to an employe, regardless of his previous physical condition, <u>except as provided under subsection (f)</u>, arising in the course of his employment and related thereto, and such disease or infection as naturally results from the injury ….
>
> (2) The terms 'injury,' 'personal injury,' and 'injury arising in the course of his employment,' as used in this act, shall include, unless the context clearly requires otherwise, occupational disease as defined in section 108 of this act. Provided, That whenever occupational disease is the basis for compensation, for disability or death under this act, it shall apply only to disability or

26

death resulting from such disease and occurring <u>within three hundred weeks after the last date of employment in an occupation or industry to which he was exposed to hazards of such disease</u> …. The employer liable for compensation provided by … <u>section 108</u>, subsections (k), (l), (m), (o), (p), (q) or <u>(r)</u>, shall be the employer in whose employment the employe was last exposed for a period of not less than one year to the hazard of the occupational disease claimed. …

77 P.S. §411(2).

Act 46 also added Section 108 of the Act, which lists compensable occupational diseases, to include (with emphasis added):

(r) Cancer suffered by a firefighter <u>which is caused by exposure to a known carcinogen</u> which is recognized as a Group 1 carcinogen by the [IARC].

77 P.S. §27.1.

In <u>Sladek</u>, we vacated an award of benefits under Section 108(r) for malignant melanoma contracted by a firefighter based on the Board's misinterpretation of the language in that provision. In <u>Sladek</u>, we determined the Board misinterpreted Section 108(r) as indicating the General Assembly established a causal relationship between any Group 1 carcinogen and any type of cancer. We noted the Board erroneously reasoned that the claimant need not show exposure to a particular carcinogen in Group 1 or establish the carcinogens to which he was exposed specifically caused his malignant melanoma. See <u>Sladek</u>, ___ A.3d at ___, Slip Op. at 16.

27

To the contrary, we observed, the General Assembly placed the words *caused by* between *cancer suffered by a firefighter* and exposure to a known Group 1 carcinogen for a reason. Therefore, a claimant must prove his cancer is caused by the Group 1 carcinogens to which he was exposed in the workplace. Id. If the claimant can establish his cancer is an occupational disease under Section 108(r), then the rebuttable presumptions in Sections 301(e) and (f) come into play. Id.

Section 301(e) of the Act, which applies to occupational diseases generally, provides (with emphasis added):

> If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive.

77 P.S. §413.

Section 301(f) of the Act applies specifically to claims for compensation for cancer suffered by a firefighter and caused by direct exposure to certain carcinogens while performing firefighter duties. Section 301(f) provides (with emphasis added):

> Compensation pursuant to cancer suffered by a firefighter shall only be to those firefighters who have served four or more years in continuous firefighting duties, who can establish direct exposure to a carcinogen referred to in section 108(r) relating to cancer by a firefighter and have successfully passed a physical examination prior to asserting a claim under this subsection or prior to engaging in firefighting duties and

28

the examination failed to reveal any evidence of the condition of cancer. The presumption of this subsection may be rebutted by substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting. … Notwithstanding the limitation under subsection (c)(2) with respect to disability or death resulting from an occupational disease having to occur within three hundred weeks after the last date of employment in an occupation or industry to which a claimant was exposed to the hazards of disease, claims filed pursuant to cancer suffered by the firefighter under section 108(r) may be made within six hundred weeks after the last date of employment in an occupation or industry to which a claimant was exposed to the hazards of the disease. The presumption provided for under this subsection shall only apply to claims made within the first three hundred weeks.

77 P.S. §414.

In Sladek, we reasoned that the presumption of causation in Section 301(e) of the Act relieves the firefighter of the need to prove his workplace exposure rather some other reason caused his cancer. If the firefighter can establish four years of continuous service and the absence of cancer prior to that service, he is entitled to compensation under Section 301(f). Sladek, ___ A.3d at ___, Slip. Op. at 15-16.

Accordingly, in Sladek we vacated the Board's order and remanded the matter for a determination as to whether the claimant's medical evidence established that melanoma is a type of cancer caused by the Group 1 carcinogens to which the claimant suffered a work-related exposure. In so doing, we noted that

29

the employer, in its appeal to the Board, argued the claimant's medical expert's opinion did not satisfy the Frye[4] standard, which requires that an expert's methodology be generally accepted in the relevant scientific community. See Pa. R.E. 702(c). Therefore, we included instructions that the Board determine whether the Act requires that claimant's medical expert's opinion must satisfy the Frye standard. If so, then the Board must determine whether that opinion satisfied the Frye standard.

In addition, we determined the WCJ and the Board erred in rejecting the employer's expert on the basis that he failed to offer an individual opinion as to the claimant's malignant melanoma or what caused it. To the contrary, we noted the employer's expert's testimony was relevant "both to the initial question of whether [the claimant's] malignant melanoma was an occupational disease and to [the employer's] rebuttal of the statutory presumption in Section 301(e) of the Act." Sladek, ___ A.3d at ___, Slip Op. at 20.

Summarizing our remand instructions, we explained the WCJ must first determine whether the claimant's expert's reports and testimony establish that the claimant's melanoma is the type of cancer caused by the Group 1 carcinogens to which the claimant was exposed at work. In so doing, the WCJ must determine claimant's expert's testimony met the requirements of Pa. R.E. 702 and the Frye

---

[4] See Frye v. U.S., 293 F. 1013 (D.C. Cir. 1923). Under the Frye standard, the proponent of scientific evidence must demonstrate the expert's methodology is generally accepted by scientists in the relevant field as a method for reaching the conclusion to which the expert will testify at trial. Grady v. Frito-Lay, Inc., 839 A.2d 1038 (Pa. 2003). The Frye standard is incorporated into Pa. R.E. 702.

standard. If so, then a remand to the WCJ is necessary for a determination of whether the claimant's or the employer's causation evidence prevails. If the claimant's evidence prevails, Section 301(e)'s presumption of causation comes into play and the claimant is relieved of having to rule out other possible causes for his melanoma. 77 P.S. §413. Next, in accord with Section 301(f), the WCJ must determine whether the claimant had four or more years of continuous firefighting, whether he suffered a direct occupational exposure to a Group 1 carcinogen, whether he successfully passed a physical examination prior to engaging in firefighting, and whether the examination failed to reveal any evidence of the condition of cancer. 77 P.S. §414. If the claimant meets those criteria, the presumption of compensability comes into play and the claimant establishes a *prima facie* case that his melanoma in compensable.

## B. Applicability of Rebuttable Presumption of Compensability

### 1. Argument

In challenging the denial of compensation in the present case, Claimant first contends the WCJ and the Board erred in interpreting the provisions of Sections 108(r), 301(c)(2), and 301(f) of the Act to require that a claimant, in order to avail himself of the rebuttable presumption of compensability in Section 301(f), must file a claim petition within 300 weeks of the last date of workplace exposure to the hazard, a requirement not included in the Act for any other occupational disease listed in Section 108 of the Act. Claimant asserts the Board's interpretation is inconsistent with the language in the amended provisions and absurdly restricts a firefighter's ability to make an occupational disease claim in comparison to every other listed occupational disease.

31

More specifically, Claimant asserts Act 46 placed cancer suffered by firefighters caused by occupational exposure to carcinogens on Section 108's list of occupational diseases compensable under Section 301(c)(2) of the Act. Section 301(c)(2) requires that an occupational disease must "occur" or manifest within *300 weeks of the last date of the claimant's exposure to the hazard*. 77 P.S. §411(2). The newly added Section 301(f), Claimant argues, modified the 300-week manifestation period by extending it to 600 weeks. Claimant further argued that the rebuttable presumptions of causation in Section 301(e) and compensability in Section 301(f) are available for firefighters with a claimable disease diagnosed within 300 weeks of their last work-related exposure to carcinogens.

In support of his position, Claimant argues the Supreme Court rejected the Board's interpretation of the 300-week manifestation period in Section 301(c)(2) of the Act as requiring a claim petition be filed within that time period. See City of McKeesport v. Workers' Comp. Appeal Bd. (Miletti), 746 A.2d 87 (Pa. 2000) (proper focal point under Section 301(c)(2) is whether the occupational disease occurred within 300 weeks of the claimant's last exposure, regardless of when the claim was filed). To that end, Claimant asserts, the three-year statute of limitations in Section 315 of the Act, 77 P.S. §602, does not begin to run in occupational disease cases until the claimant learns, by a competent medical diagnosis, that his disability is work-related. Price v. Workmen's Comp. Appeal Bd. (Metallurgical Resources), 626 A.2d 114 (Pa. Cmwlth. 1993). Under the WCJ's erroneous interpretation, Claimant maintains, a firefighter diagnosed with cancer would have to file a claim petition within 300 weeks of the occurrence of

32

the disease in order to qualify for the rebuttable presumption of causation regardless of whether the firefighter knows the disease is work-related.

In short, Claimant contends the Board's interpretation of Sections 301(c)(2) and 301(f) as requiring that a firefighter diagnosed with cancer file his claim within 300 weeks of his last date of exposure in order to come within the presumption of compensability improperly treats firefighters with cancer differently from employees suffering from any other occupational disease listed in Section 108 of the Act. Rather, Claimant asserts, the 300-week period for cancer claims under Section 108(r) properly runs from the date of diagnosis, not the date of filing the claim. City of McKeesport. Therefore, Claimant maintains, because his cancer occurred within 300 weeks of his last exposure, the WCJ erred in denying him the rebuttable presumption of compensability in Section 301(f).

## 2. Analysis

Claimant first argues the Board misconstrued the language in 301(f) of the Act as requiring him to file a claim petition under Section 108(r) within 300 weeks of his last day of employment with exposure to the hazard in order to be entitled to Section 301(f)'s presumption of compensability. We disagree. The issue is not whether the statutory language places a limitation on the time to file a firefighter cancer claim; rather, the issue is whether the statutory language limits the time frame in which the presumption of compensability applies.

### a. Statutory Limitations on Presumption

In order to be entitled to the presumption of compensability in Section 301(f), a firefighter must have at least four years of continuous firefighting duties and be able to establish direct exposure to a Group 1 carcinogen. Here the WCJ found Claimant satisfied these requirements. F.F. No. 13.

Nonetheless, Section 301(f) also requires that "claims filed" under Section 108(r) "be made within six hundred weeks of the last date of employment in … which a claimant was exposed to the hazards of the disease." 77 P.S. §414 (emphasis added). Here, Claimant sought benefits in April 2012 for a three-month closed period from March 2006 to June 2006. Clearly, Claimant filed his claim within the 600-week period following his last day of employment as a firefighter.

However, Claimant filed his claim petition approximately 318 weeks after his radical prostatectomy in March 2006. See WCJ Op., F.F. No. 1i; Bd. Op. at 15. Claimant's disability arising from prostate cancer arose in March 2006, and it extended for three months (approximately 12 weeks). After this period, Claimant was not disabled by an occupational disease. Any exposure after his return to work in 2006 and before his retirement in 2008 could not be causally related to his prostate cancer, which was already cured by surgery and therapy before his return to work. Bd. Op. at 15, n.5. Therefore, the Board determined the WCJ did not err in ruling Claimant ineligible for Section 301(f)'s presumption of compensability. Bd. Op. at 15.

As the Board noted, the pivotal question in this case is causation. Although Claimant's cancer occurred in 2006, he filed his claim petition in 2012,

outside of the 300-week period entitling him to the rebuttable presumption of compensability in Section 301(f) of the Act.

### b. Proof of Causation

Regardless of the date he files his petition, a claimant seeking compensation for cancer under Section 108(r) must establish that his disease is a type of cancer caused by exposure to a carcinogen recognized as a Group 1 carcinogen by the IARC. 77 P.S. §27.1(r). Here, the WCJ found that Claimant's Expert's testimony "did not credibly or persuasively establish that exposures to Group I carcinogens were a significant contributing factor in the cause of Claimant's prostate cancer." WCJ Op., 9/29/14, F.F. No. 14 (emphasis added). In rejecting Claimant's Expert's testimony on the issue of causation, the WCJ noted (with emphasis added):

> a) [Claimant's Expert] has never designed a study protocol, has never published on the etiology of cancer or firefighters specifically and has performed no research on the etiology of prostate cancer.
>
> b) He did not know the methodologies to use in attempting to link a given exposure to a given cancer, used by the EPA, the Veterans Administration, the IARC, the National Academy of Sciences, the American Medical Association ….
>
> c) He was not able to cite any authority for his assertion that the differential diagnosis methodology is the accepted methodology for determining a potential causative relationship between a given agent and a given cancer.
>
> d) Regarding the studies on which he relied, he agreed that he is not an epidemiologist and that he was not able

35

to assess reliability based on study design. He was also not familiar with the Bradford Hill criteria used in epidemiological research to determine a cause-and-effect relationship between a particular agent and the development of a disease, as explained by both [Employer's Expert] and Dr. Stanford. …

e) He agreed that the CDC and other sources have articulated that the most common risk factors for prostate cancer were race, family history and age.

f) [Claimant's Expert] never treated or examined … Claimant and the medical records that he reviewed only went back to 2006. He agreed that his reports did not mention potential causes other than firefighting that contributed to the development of cancer, such as exposure at Claimant's second job, his ethnic background, diet, geography and possible exposures during military service.

F.F. Nos. 14a-f.

In addition, with respect to Employer's medical evidence, the WCJ found (with emphasis added):

This WCJ finds that [Employer's Expert's] testimony credibly and persuasively established that [Claimant's Expert's] opinion did not conform to usual epidemiologic standards for the formation of a general causation opinion. [Employer's Expert] also credibly and persuasively explained that any elevated risks for prostate cancer among firefighters might also be explained by other factors, such as detection bias, ethnicity and geography. Consistent with [Employer's Expert's] opinions, Dr. Stanford also credibly explained that a complex disease such as prostate cancer had multiple factors contributing to causation and that the interaction between genetic and environmental … or lifestyle factors had not yet been well studied due to large sample sizes needed for proper assessment.

36

WCJ Op., F.F. No. 15.

In workers' compensation cases, the WCJ is the ultimate fact-finder and has exclusive province over questions of credibility and evidentiary weight. A&J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi), 78 A.3d 1233 (Pa. Cmwlth. 2013). The WCJ may accept the testimony of any witness, including a medical witness, in whole or in part. Id. We are bound by the WCJ's credibility determinations. Id.

Moreover, it is irrelevant whether the record contains evidence supporting findings other than those made by the WCJ; the crucial inquiry is whether the evidence supports the findings actually made. Id. Therefore, we must examine the entire record to see if it contains evidence a reasonable person might find sufficient to support the WCJ's findings. Id. If the record contains such evidence, the findings must be upheld, even though the record may contain conflicting evidence. Id. Additionally, we must view the evidence in the light most favorable to the prevailing party and give it the benefit of all inferences reasonably deduced from the evidence. Wagner v. Workers' Comp. Appeal Bd. (Anthony Wagner Auto Repairs & Sales, Inc.), 45 A.3d 461 (Pa. Cmwlth. 2012).

In light of the WCJ's adverse credibility determinations in the present case, Claimant failed to establish a causal relationship between his prostate cancer and his occupational exposure to a carcinogen recognized as a Group 1 carcinogen by the IARC. Consequently, regardless of the date he filed his claim petition,

37

Claimant was not entitled to the presumption of compensability in Section 301(f) of the Act. Sladek.

## C. Applicability of Discovery Rule

### 1. Argument

Claimant further contends that if Section 301(f) creates a 300-week limitation on filing a petition under Section 108(r) in order to qualify for the presumption of compensability, the discovery rule applies and the statute of limitations does not begin to run in occupational disease cases until the claimant learns, by a competent medical diagnosis, that his disability is work-related. Price.

In response, Employer argues that the language "Notwithstanding the limitation under subsection (c)(2)" in Section 301(f) indicates the General Assembly's intent that Section 301(f) operate as a statute of repose and bar any claims for cancer filed more than 600 weeks (approximately 11.5 years) after the claimant's last day of occupational exposure to the carcinogen. See Tooey v. AK Steele Corp., 81 A.3d 851 (Pa. 2013) (300-week time provision in Section 301(c)(2) of the Act bars a claim for an occupational disease that manifests itself more than 300 weeks after the claimant's last day of exposure to the hazard). Here, however, Claimant filed his claim petition within the 600-week period. As such, there is no statute of limitations issue.

Employer also argues the same rationale applies to the 300-week limitation period in Section 301(f) for the application of the presumption of compensability. The plain language of 301(f) limits application of the presumption

38

of compensability to claims filed within the first 300 weeks of the last date of occupational exposure to a carcinogen referenced in Section 108(r). Therefore, Employer urges, the discovery rule is inapplicable here.

## 2. Analysis

As discussed above, Claimant misstates the issue. The issue is not whether a statute of limitations resulted in the denial of Claimant's firefighter cancer claim. As explained above, his filing of the claim was timely. Rather, the issue is whether Claimant may rely on the statutory presumption of compensability.

In any event, Claimant failed to establish a causal relationship between his prostate cancer and his occupational exposure to a carcinogen recognized as a Group 1 carcinogen by the IARC. Thus, regardless of the date he filed his claim petition, the presumption of compensability in Section 301(f) of the Act is unavailable to Claimant. Sladek. Therefore, any further discussion of whether the discovery rule applies to the 300-week filing limitation period for the application of the presumption of compensability is unnecessary in this case. As such, this issue is moot. See Battiste v. Borough of E. McKeesport, 94 A.3d 418 (Pa. Cmwlth. 2014) (a court may, on its own, raise the issue of mootness as courts cannot decide a controversy that no longer exists; an actual controversy must be extant at all stages of review).

## D. Competency of Employer's Medical Evidence

## 1. Argument

Claimant further contends, in light of the WCJ's alternative conclusion that Employer's Expert's testimony rebutted any presumption (C.L. No. 3), that Employer's Expert's opinion is incompetent and therefore inadequate to rebut the presumption of compensability in Section 301(f). In particular, Claimant asserts Employer's Expert failed to offer an opinion specific to Claimant's individual circumstances. Claimant further asserts the WCJ failed to address Employer's Expert's admissions that: epidemiology measures risks in populations, not in individual cases; a general causation or epidemiologic opinion is not dispositive whether exposures were a substantial contributing factor in a specific individual's cancer; and, for specific causation, clinical judgment, taking into account the individual characteristics of the claimant is required. See Dep. of Dr. Tee L. Guidotti, 1/12/13 (Guidotti Dep.) at 81-83; R.R. at 172.

Claimant also cites Section 301(f), which states in part that the rebuttal presumption of compensability in that provision "may be rebutted by substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting." 77 P.S. §414 (emphasis added). Here, Employer's Expert failed to provide an opinion as to the cause of Claimant's prostate cancer. Where a claimant proves he is afflicted by an occupational disease listed in Section 108 of the Act, the presumption of causation can only be rebutted by substantial competent evidence. Jeannette Dist. Mem. Hosp. v. Workmen's Comp Appeal Bd. (Mesich), 668 A.2d 249 (Pa. Cmwlth. 1995). An opinion that fails to establish that the cause of the disease was not work-related cannot rebut the presumption. Id.

40

Here, Claimant maintains, Employer's Expert testified he did not question Claimant's diagnosis and he did not provide any opinion as to what particularly caused Claimant's or any other firefighter's cancer. Guidotti Dep. at 149; R.R. at 189. In the absence of any opinion specific to the cause of his cancer, Claimant argues Employer's Expert's opinion cannot rebut the presumption of compensability in Section 301(f).

### 2. Analysis

As discussed above, Claimant failed to establish a causal relationship between his prostate cancer and his occupational exposure to a carcinogen recognized as a Group 1 carcinogen by the IARC. Thus, regardless of the date he filed his claim petition, the presumption of compensability in Section 301(f) of the Act is unavailable to Claimant. Sladek. Therefore, the initial burden of proving causation remained with Claimant. However, the WCJ found Claimant's Expert's testimony failed to credibly or persuasively prove that Claimant's exposure to Group I carcinogens constituted a significant contributing factor in the cause of his prostate cancer. F.F. No. 14.

Notably, Claimant's Expert and Employer's Expert were also the primary medical experts in Sladek. In that case, the Board noted that although Employer's Expert offered a general opinion that the only known cause of malignant melanoma is ultraviolet radiation, he did not offer an opinion as to what caused the claimant's melanoma. Citing Mesich, the Board found Employer's Expert's testimony insufficient to rebut the presumption that the claimant's melanoma was work-related. On appeal, we determined the Board erred and

41

concluded that Employer's Expert's testimony was relevant to both the initial question of whether the claimant's cancer constituted an occupational disease under Section 108(r) and the question of whether the employer rebutted the statutory presumptions in Sections 301(e) and (f). Sladek, ___ A.3d at ___, Slip Op. at 19-20.

Our rationale in Sladek is also applicable here. Although Employer's Expert did not offer an opinion specific to Claimant's individual circumstances, the presumption of compensability in Section 301(f) did not come into play in this case. Therefore, Claimant had the initial burden of establishing causation. To that end, Employer's Expert did testify as to several objective reasons for rejecting Claimant's Expert's opinions, including the fact he was not an epidemiologist and the studies upon which he relied had many flaws. See F.F. No. 14d.

In addition, in determining whether medical evidence is unequivocal and therefore competent to support a factual determination, we review the testimony as a whole and do not base our analysis on a few words taken out of context. Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods), 37 A.3d 72 (Pa. Cmwlth. 2012); Hannigan v. Workmen's Comp Appeal Bd. (Asplundh Tree Expert Co.), 616 A.2d 764 (Pa. Cmwlth. 1992). Thus, although Claimant argues that Employer's Expert admitted that general epidemiology measures risks in populations, not individuals, this does not render incompetent his testimony that Claimant's Expert is not an epidemiologist and that the studies he relied on were not an adequate basis for Claimant's Expert's opinion that the prostate cancers of

42

the firefighters' cases he reviewed were work-related.  F.F. No. 14f; <u>Amandeo</u>; <u>Hannigan</u>.

In short, Claimant's Expert's testimony failed to establish a causal relationship between Claimant's prostate cancer and his occupational exposure to a carcinogen recognized as a Group 1 carcinogen by the IARC.  Therefore the burden of rebutting an established causal relationship did not fall upon Employer. As such, Claimant's contention that Employer's Expert's testimony does not constitute substantial competent evidence because it does not address Claimant's individual condition or identify the cause of his prostate cancer lacks merit.

## IV. Conclusion

For the above reasons, we agree with the Board's order upholding the WCJ's denial of Claimant's claim petition.  Accordingly, we affirm.

_____
ROBERT SIMPSON, Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Earl Hutz,                 :
          Petitioner    :
                    :
        v.            :   No. 2140 C.D. 2015
                    :
Workers' Compensation Appeal   :
Board (City of Philadelphia),     :
          Respondent   :

**O R D E R**

**AND NOW**, this 7th day September, 2016, for the reasons stated in the foregoing opinion, the order of the Workers' Compensation Appeal Board is **AFFIRMED**.

 

                            _____
                            ROBERT SIMPSON, Judge