IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Charles Sessions, : 
               Petitioner : 
  : 
        v. : No. 1223 C.D. 2017
  : Submitted: February 23, 2018
Workers' Compensation Appeal : 
Board (City of Philadelphia), : 
            Respondent : 


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI                FILED: March 15, 2018


Charles Sessions (Claimant) petitions for review of the Workers' Compensation Appeal Board's (Board) order affirming the Workers' Compensation Judge's (WCJ) decision denying him benefits under Section 108(r) of the Workers' Compensation Act (Act),[1] 77 P.S. § 27.1(r), for prostate cancer he allegedly contracted from exposures as a firefighter.


**I.**

Before reaching the particular facts of this appeal, a brief review of the relevant statutory provisions and case law is helpful.

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4, 2501–2708.

**A.**

As pertinent, the statutory scheme is as follows. Section 301(c)(2) of the Act states that a compensable "injury" includes "occupational disease as defined in section 108 of this act." 77 P.S. § 411(2). Section 108 lists a number of occupational diseases. Pertinently, in 2011, the General Assembly enacted Act 46,[2] which added Section 108(r), recognizing the occupational disease of "[c]ancer suffered by a firefighter which is caused by exposure to a known carcinogen which is recognized as a Group 1 carcinogen by the International Agency for Research on Cancer [(IARC)]." 77 P.S. § 27.1(r).

Section 301(e) of the Act establishes a "presumption regarding occupational disease" that applies to any occupational disease, and provides:

> If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, **it shall be presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive**.

77 P.S. § 413 (emphasis added). Act 46 added Section 301(f), which adds another condition to that presumption where the occupational disease is cancer suffered by a firefighter. It provides, in relevant part:

---

[2] Act of July 7, 2011, P.L. 251.

2

Compensation pursuant to cancer suffered by a firefighter shall only be to those firefighters who have served four or more years in continuous firefighting duties, who can establish direct exposure to a carcinogen referred to in section 108(r) relating to cancer by a firefighter and have successfully passed a physical examination prior to asserting a claim under this subsection or prior to engaging in firefighting duties and the examination failed to reveal any evidence of the condition of cancer. The presumption of this subsection may be rebutted by substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting. . . .

77 P.S. § 414. In other words, to establish a claim under Section 108(r), it must be shown that: (i) the claimant worked for four or more years in continuous firefighting duties, (ii) the claimant had direct exposure to a carcinogen classified as Group 1 by the IARC, and (iii) the claimant passed a physical examination prior to engaging in firefighting duties that did not reveal evidence of cancer.

As for the timing of a claim petition, Section 301(f) continues:

Notwithstanding the limitation under subsection (c)(2) with respect to disability or death resulting from an occupational disease having to occur within **three hundred weeks** after the last date of employment in an occupation or industry to which a claimant was exposed to the hazards of disease, claims filed pursuant to cancer suffered by the firefighter under section 108(r) may be made within **six hundred weeks** after the last date of employment in an occupation or industry to which a claimant was exposed to the hazards of disease. The presumption provided for under this subsection shall only apply to claims made within the first three hundred weeks.

3

*Id.* (emphasis added). Section 301(c)(2), which is referenced above, provides, in pertinent part:

> That whenever occupational disease is the basis for compensation, for disability or death under this act, it shall apply only to disability or death resulting from such disease and **occurring within three hundred weeks after the last date of employment** in an occupation or industry to which he was exposed to hazards of such disease . . . .

77 P.S. § 411(2).[3]

## B.

Our first occasion to interpret Section 108(r) of the Act was in *City of Philadelphia Fire Department v. Workers' Compensation Appeal Board (Sladek)*, 144 A.3d 1011 (Pa. Cmwlth. 2016) (*en banc*), *appeal granted City of Philadelphia Fire Department v. Workers' Compensation Appeal Board (Sladek)*, 167 A.3d 707 (Pa. 2017).[4] In that case – brought by Claimant's current counsel – we vacated an

---

[3] This Court has held that Section 301(f) of the Act requires a firefighter to file a claim petition within 300 weeks of his last day of employment in order to take advantage of the statutory presumption that his cancer was work-related. *See Hutz v. Workers' Compensation Appeal Board (City of Philadelphia)*, 147 A.3d 35 (Pa. Cmwlth. 2016), and *Demchenko v. Workers' Compensation Appeal Board (City of Philadelphia)*, 149 A.3d 406 (Pa. Cmwlth. 2016). The 300-week period is measured by the time between (1) claimant's "last date of employment in an occupation or industry to which the claimant was exposed to the hazards of disease," and (2) the date the claim petition is filed. *Fargo v. Workers' Compensation Appeal Board (City of Philadelphia)*, 148 A.3d 514, 520 (Pa. Cmwlth. 2016), *appeal denied*, 168 A.3d 1245 (Pa. 2017); *Hutz*, 147 A.3d at 52–53 (Pa. Cmwlth. 2016).

[4] On March 1, 2017, our Supreme Court granted a petition for allowance of appeal for the following issues:

**(Footnote continued on next page…)**

4

award of benefits under Section 108(r) that was based on the Board's misinterpretation of the language in that provision and held that Section 108(r) requires a claimant-firefighter to prove his particular type of cancer "is a type of cancer *caused by* the Group 1 carcinogens to which he was exposed in the workplace to establish an occupational disease. **Only then** do the presumptions in Section 301(e) and (f) of the Act come into play." *Sladek*, 144 A.3d at 1021-22 (emphasis added).

Since the claimant's counsel filed the initial claim petition in *Sladek*, he has gathered approximately 40 firefighter-claimants, 26 of which have been diagnosed with prostate cancer.[5]

---

**(continued…)**

> (1) Whether the Commonwealth Court, in a case of first impression, committed an error of law by misinterpreting Section 108(r) to require a firefighter diagnosed with cancer caused by an IARC Group I carcinogen to establish exposure to a specific carcinogen that causes his/her cancer in order to gain the rebuttable presumption provided by the law?
>
> (2) Whether the Commonwealth Court committed an error of law by concluding that a legislatively-created presumption of compensability may be competently rebutted by a general causation opinion, based entirely upon epidemiology, without any opinion specific to the firefighter/claimant making the claim?

*City of Philadelphia Fire Department v. Workers' Compensation Appeal Board (Sladek)*, 167 A.3d 707 (Pa. 2017).

[5] *See Campbell v. Workers' Compensation Appeal Board (City of Philadelphia)*, (Pa. Cmwlth., 1385 C.D. 2016, filed June 28, 2017); *Lee v. Workers' Compensation Appeal Board (City of Philadelphia)*, (Pa. Cmwlth., 1562 C.D. 2016, filed May 24, 2017); *Kimberly Clark* **(Footnote continued on next page…)**

Significantly, in all of these cases, Claimant's counsel, on behalf of the claimant-firefighters, has mainly presented the same exact deposition and documents. These include the same "global deposition" and reports of Barry L. Singer, M.D. (Dr. Singer), board certified in internal medicine, hematology and medical oncology, as well as other reports and letters offered by experts opining that certain firefighter exposures cause, *inter alia*, prostate cancer. In addition, in each of those cases, the employer/defendant has responded with its own expert reports and testimony. Primarily, these documents include the reports and deposition of Tee Guidotti, M.D., M.P.H. (Dr. Guidotti), who is board certified in internal medicine, pulmonary medicine and occupational disease, and is trained in toxicology and epidemiology. In essence, his reports and testimony do not go to the specific causation of any particular firefighters' cancer. Rather, it only serves as a critique to Dr. Singer's conclusions, credentials and methodology, opining that

---

**(continued…)**

*Corp. v. Workers' Compensation Appeal Board (Bromley)*, 161 A.3d 446 (Pa. Cmwlth.), *reargument denied* (July 7, 2017), *appeal denied*, 174 A.3d 1027 (Pa. 2017); *Logan v. Workers' Compensation Appeal Board (City of Philadelphia)*, (Pa. Cmwlth., 2605 C.D. 2015, filed March 9, 2017); *Campbell v. Workers' Compensation Appeal Board (City of Philadelphia)*, (Pa. Cmwlth., 1031 C.D. 2016, filed March 3, 2017); *City of Warren v. Workers' Compensation Appeal Board (Haines)*, 156 A.3d 371 (Pa. Cmwlth.), *appeal denied sub nom. City of Warren (Fire Department) v. Workers' Compensation Appeal Board*, 170 A.3d 1039 (Pa. 2017); *Szymanski v. Workers' Compensation Appeal Board (City of Philadelphia)*, (Pa. Cmwlth., 494 C.D. 2016, filed February 14, 2017); *Capaldi v. Workers' Compensation Appeal Board (City of Philadelphia)*, 152 A.3d 1107 (Pa. Cmwlth. 2017); *Lucas v. Workers' Compensation Appeal Board (City of Sharon)*, (Pa. Cmwlth., 2606 C.D. 2015, filed December 20, 2016); *Demchenko v. Workers' Compensation Appeal Board (City of Philadelphia)*, 149 A.3d 406 (Pa. Cmwlth. 2016); *Fargo v. Workers' Compensation Appeal Board (City of Philadelphia)*, 148 A.3d 514, 516 (Pa. Cmwlth. 2016), *appeal denied*, 168 A.3d 1245 (Pa. 2017); *Hutz v. Workers' Compensation Appeal Board (City of Philadelphia)*, 147 A.3d 35 (Pa. Cmwlth. 2016).

there is insufficient evidence to support the conclusion that firefighting causes prostate cancer.

Dating back to our decision in *Hutz*, the result is consistently the same. While various WCJs have found that unequivocal evidence establishes that these claimant-firefighters were exposed to Group I carcinogens during their career as firefighters, each also found that Dr. Singer did not credibly or persuasively establish that exposure to these carcinogens was a significant contributing factor in contracting their type of cancer. Several of these cases have dealt with the denial of Section 108(r) claims for compensation for prostate cancer, which, save for particularized reports and testimony about the firefighter-claimant, have involved almost identical records. *See Hutz*, 147 A.3d at 45-46, 56-57; *see also Demchenko*, 149 A.3d at 414-16.

With all of that, we turn to the underlying facts of this appeal.

## II.

## A.

Claimant was employed by the City of Philadelphia Fire Department (Employer) since July 29, 1985, first as a firefighter and then as a fire lieutenant. While still employed by Employer, in September 2002, he was diagnosed with prostate cancer via biopsy and underwent a retropubic radical prostatectomy on November 4, 2002. He did not return to work until March 2003 after which he retired on July 22, 2007.

7

In October 2012, after the claimant in *Sladek* filed his initial claim petition, Claimant received a letter from his attorney, who had not yet been retained, with a report from Dr. Singer. Until he received that letter, he was unaware that his prostate cancer may have been related to his fire exposures. As a result, and even though it had been almost ten years since his surgery and recovery, Claimant filed a claim petition pursuant to Section 108(r) of the Act, alleging that he sustained prostate cancer as a result of exposures while working as a firefighter on September 25, 2002. Claimant sought total disability benefits from November 4, 2002, to March 1, 2003, and payment of medical bills. Employer filed an Answer denying the material allegation of the claim petition.[6]

Before the WCJ, Claimant testified that he was 50 years old when he was diagnosed with prostate cancer. Before his diagnosis, he never had any problems with his prostate. The diagnosing doctor was Dr. Richard Greenberg (Dr. Greenberg), and his family doctor at the time was Dr. Gene Geld (Dr. Geld). He is still currently under the care of both doctors. Because of the procedure, he now has erectile dysfunction and leakage and medication does not help either issue. He also receives periodic testing of prostate-specific antigen (PSA).

Regarding his employment with Employer, Claimant was given a physical when he was hired and had several more during his employment, none of which resulted in restrictions. He was never treated for any type of cancer before

---

[6] Although Claimant also filed a penalty petition, the WCJ ultimately denied that petition and Claimant did not appeal.

becoming a firefighter. Claimant testified that he worked at a number of different stations, all of which had at least two diesel-powered trucks but did not have diesel fuel emission capture systems. He routinely smelled diesel fuel emissions. He also cleaned the firehouses periodically, which involved cleaning soot and diesel fuel residue off the wall.

During his career, Claimant worked in fire suppression, which involves putting the fire out and dragging the hose line in, raising ladders, opening walls and and roofs, ventilating, as well as search and rescue. He also worked in overhaul, which involves opening up walls and floors to search for hidden fire or smoldering fires. Smoke is visible in all of these phases. He has fought structure fires, grass fires, car fires, commercial fires, high-rise fires, chemical fires and rubbish fires.

Claimant testified that early in his career, he remembered one man being assigned a self-contained breathing apparatus (SCBA), and that in the 1990s, it became mandatory to wear one. However, even then, SCBAs were not used in all phases of firefighting, such as during overhaul, exterior fires and car fires. He testified that the last fire he fought was a dwelling fire in mid-July 2007, but he could not provide an exact date.

Prior to becoming a firefighter, Claimant served in the Navy from 1972 to 1979, first as an aviation ordnance aircrew member, where he did have exposure to jet fuel at naval stations, and then as a recruiter. He was never on a

naval ship, but agreed that he was regularly around jet fuel and jet emissions. After that, he worked as an apprentice plumber.

Regarding his history with cancer, Claimant testified that his father, a lifetime smoker, had throat cancer, but no one else in his family had a history of cancer. Claimant has never smoked and his wife does not smoke. However, he was exposed to tobacco smoke at the firehouse where there were no restrictions on smoking until the late 1990s or 2000.

**B.**

Following Claimant's testimony, he submitted into evidence reports specific to his claim. The first was a February 22, 2012 report from Dr. Geld, stating that Claimant's routine physical examinations before 2002 found him to be cancer free. The second is the April 16, 2012 report of Dr. Singer, who reviewed an affidavit of personal history created by Claimant as well as the records of his surgical oncologist, Dr. Greenberg. In that report, Dr. Singer identified studies relating to firefighter exposure and prostate cancer and opined, in pertinent part:

> I have reviewed the general literature regarding firefighters and cancer. Firefighters are exposed to smoke at every fire particularly the overhaul phase. Although [Claimant] did not wear a SCBA towards the end of his career, he certainly did not wear it 100% of the time. He also did not wear it during overhaul since it was not required. Various carcinogens are present in smoke since smoke is a complex mixture of cancer causing chemicals depending on what is burning. The IARC Group 1 carcinogens most commonly found in smoke include arsenic, asbestos, benzene, benzo(a)pyrene, 1,3-butadiene, formaldehyde and soot. Also there are common IARC Group 2-A carcinogens found in smoke

10

consisting of creosote, diesel engine exhaust, polychlorinated biphenyls, polycylic aromatic hydrocarbons and styrene.

* * *

Upon completion of my review of these records it is my opinion that [Claimant's] exposure to carcinogens while working for [Employer] was a substantial contributing factor in the development of his prostate cancer. The records I reviewed . . . indicate this patient received all necessary and appropriate care for treatment of his prostate. He continues to have follow-up regularly [with Dr. Greenberg] at Fox Chase Cancer Center.

I hold all my opinions within a reasonable degree of medical certainty.

(Reproduced Record (R.R.) at 5a-6a.) Significantly, Dr. Singer's report does not point to any particular carcinogen that is linked to causing prostate cancer.

## C.

As in *Hutz* and *Demchenko*, Claimant and Employer also submitted a number of documents relating to firefighter exposure and prostate cancer. For simplicity, these documents will be discussed in their logical order.

## 1.

Regarding firefighter exposures and cancer, Claimant first submitted medical reports from Virginia Weaver, M.D. (Dr. Weaver), a physician board certified in internal medicine and occupational medicine. Dr. Weaver opined that, within a reasonable degree of medical certainty, firefighters are exposed to IARC Group 1 carcinogens in the course of their work, many of which are found in

11

smoke from burning structures, including buildings and automobiles. Although firefighters use protective equipment, the degree of protection is nevertheless incomplete; firefighters routinely observe black soot on their skin and in nasal discharges after major fires, and until recently, most firefighters routinely removed their respiratory protection during the overhaul process. She also explained that firefighters have been exposed to diesel exhaust in fire stations for many years, and that recent studies by the National Cancer Institute and the National Institute for Occupational Safety and Health provide additional data supporting the carcinogenicity of diesel exhaust.

Significantly, Dr. Weaver did not offer any specific testimony or evidence relating to the causal relationship between certain Group 1 carcinogens that firefighters are exposed to in the course of their work and prostate cancer.

**2.**

Claimant also submitted the global deposition of Dr. Singer. Dr. Singer's testimony pertains to his methodology and the way that he reviews and provides his opinion for those cases. During that deposition, Dr. Singer testified that he has treated cancer patients for more than 40 years, focusing on breast, colon and lung cancers. He is not an epidemiologist or toxicologist and does not specialize in the etiology of cancer.

Dr. Singer stated that in 2008, he was contacted by Claimant's attorney to evaluate the cancer history of a number of firefighters to determine whether their cancer was work-related and, thus, compensable under the Act. He

estimated that since 2008, he has reviewed 40 to 50 cases on referral from Claimant's attorney. Approximately 25 of those referrals involved firefighters with prostate cancer. Dr. Singer testified that with each referral, he reviews the firefighter's medical history and an affidavit from the firefighter about his job duties, length of service and family medical history. Dr. Singer did not conduct a physical examination of any firefighter referred to him. Claimant's attorney also sends Dr. Singer articles from medical literature relevant to firefighters and cancer. Dr. Singer evaluates these materials and then prepares a report, following the above process.

Regarding the affidavits submitted by Claimant's attorney, Dr. Singer explained that these documents "usually give a pretty thorough occupational history, how long they were members or if they're still members of the fire department, their family history and a brief medical history. Of course the medical history I get mainly from the records." (R.R. at 85a.)

Dr. Singer testified that he uses a differential diagnosis methodology to assess the cause of a firefighter's cancer, which practitioners use to assess the history and symptoms of their patients. While Dr. Singer stated that this is not an uncommon approach for him to use, he acknowledged on cross-examination that there is an absence of scientific authority for the use of this methodology to determine a causal connection between a given agent and a given cancer.

Regarding the terminology contained in his individual reports, Dr. Singer explained that a "substantial contributing factor" in the development of

13

prostate cancer meant that if that factor did not exist, more likely than not the firefighter would not have developed the disease; but for that factor, the disease would not be present at the time. (R.R. at 128a.)

On cross-examination, Dr. Singer acknowledged that the Center for Disease Control (CDC) and other sources identify race, ethnicity, family history and age as the most common risk factors for prostate cancer. He also agreed that 20% of all men will be diagnosed with prostate cancer during their lifetime, and that prostate cancer is the leading cancer among men.

Dr. Singer also acknowledged a number of flaws in the studies he cited in reaching his opinions. For example, he had not considered the methodologies used by public health experts to determine what exposures cause cancer, including studies published by the Environmental Protection Agency, Veterans Administration, the National Academy of Science, and the IARC. Nor did Dr. Singer consider the American Medical Association's Guides to the Evaluation of Disease and Injury Causation, the Federal Court handbook or the Bradford Hill criteria. Dr. Singer did not do his own analysis of studies reported in the literature or do any lab testing. He admitted that none of the studies he reviewed were controlled for smoking. Further, Dr. Singer admitted that he was unaware that the Pennsylvania Department of Health concluded that simply living in Philadelphia, as the only controlled criteria, increased the risk of prostate cancer by 40.6%. He also did not study the Philadelphia population as to diet, environmental exposures, ethnic heritage, geography or proximity to toxic waste sites.

14

**3.**

Employer, in response, submitted the deposition testimony and several reports of Dr. Guidotti. Dr. Guidotti opined, within a reasonable degree of medical certainty, that there is insufficient evidence from which to conclude that firefighting causes prostate cancer as a matter of general causation. As he points out, prostate cancer is not commonly attributable to occupational exposures, and it is the leading type of cancer among men and at least 20% of all men will be diagnosed with it at some point in their lifetime. Age is the primary risk factor for prostate cancer. During the late 40s and early 50s, the risk increases and accelerates quickly. Family history is the next risk factor. An individual with a male parent with prostate cancer is a first-degree risk.

Dr. Guidotti also asserted there were numerous flaws in Dr. Singer's methodology and analysis due to his background as an oncologist rather than as an expert in the cause of cancer. For example, Dr. Guidotti opined that regarding Dr. Singer's reports for the Philadelphia firefighters, he could not discern any methodology used by Dr. Singer. Rather, it appeared that he rubber-stamped the language of the studies without any weighing of the evidence or further discussion. Moreover, Dr. Singer's understanding of the nature of the exposure was limited to the information contained in the firefighters' affidavits; he did not discuss the existence of other risk factors that could have played a role in the development of cancer such as diet and smoking history. Although Dr. Singer alluded to several Group 1 carcinogens, he did not match any carcinogen to a specific type of cancer.

Thus, based on the foregoing, Dr. Guidotti concluded that the opinion submitted by Dr. Singer did not meet the standards generally accepted in the scientific or medical communities for evaluating general causation in an occupational case. Dr. Guidotti did not, however, offer an opinion with respect to any particular case or claimant.

Employer also submitted a March 2013 report from Janet L. Stanford, Ph.D. (Dr. Stanford), who is a former Head of the Prostate Cancer Research Program at the Fred Hutchinson Cancer Research Center and is currently a research professor in the Epidemiology Department and an adjunct research professor in the Urology Department at the University of Washington. As pertinent, Dr. Stanford opined that the median age for prostate cancer is 67 years, with the median age for Caucasian Americans as 68 years and African Americans as 64 years. Dr. Stanford also opined that about 58% of prostate cancer etiology is due to environmental/lifestyle factors. While it is possible to estimate a likelihood that an exposure may be associated with prostate cancer, she opined that it is not possible to prove causality.

**4.**

As a response to Dr. Guidotti's criticisms, Dr. Singer submitted another December 19, 2012 report. Aside from defending his methodology, which he has used for 40 years, Dr. Singer's report further elaborates on the causal relationship between certain firefighter exposures and prostate cancer. In pertinent part, that report provides that while firefighters encounter a combination of carcinogens, and that these carcinogens can have a synergistic effect that increases

16

the risk of cancer, "[s]everal of the carcinogens have been **related to** specific cancers in reliable studies and literature. . . . For example, prostate cancer can be **associated** with arsenic, [polycyclic aromatic hydrocarbon (PAH)], and phthalates." (R.R. at 262a-263a) (emphasis added). Moreover, epidemiologic and academic literature has "evaluat[ed] the biologic **association** between firefighter carcinogen exposures and prostate cancer . . . [and] confirm[s] an **increased incidence** of prostate cancer in the fire service." His conclusions are "also supported by significant and reliable literature that supports the **biologic plausibility of the association** between firefighting and prostate cancer." (R.R. 263a) (emphasis added).

### 5.

In support of Dr. Singer's reports and in response to Dr. Guidotti's reports, Claimant also presented the November 20, 2012 report of Grace K. LeMasters, Ph.D. (Dr. LeMasters), a professor of epidemiology and biostatistics. As pertinent, that report challenges Dr. Guidotti's overall conclusions regarding firefighter exposures and prostate cancer, as well as his statements that a detection (or screening) bias explained the increased risk estimate for firefighters because 30% of the studies were generally completed before the PSA was in wide use.

Her report also provides that the two most likely cancers to occur in firefighters were testicular and prostate. She noted that while the average age at diagnosis for prostate cancer is 67, out of the 26 cases presented by Claimant's attorney, only four firefighters were diagnosed after age 60. Of particular concern is that three were diagnosed in their 40s, which she opined is rare, nine were

17

diagnosed in their low 50s, and 11 between ages 56 and 60. Consequently, of the 26 cases, 42% were diagnosed at a relatively young age for prostate cancer.

She also opined that there is a "biologic plausibility[7] that exposure to endocrine disrupters (plasticizers) as well as chemicals known to induce genetic and/or epigenetic changes, provides biologic pathways for both prostate and testicular cancer as found by the IARC and LeMasters meta-analysis." (R.R. at 43a.) Specifically, phthalate esters (an IARC Class 2B carcinogen), which are in many household plastics commonly found in fires, are endocrine disruptors that may cause prostate cancer, and the chemical class of [PAH], which "includes many carcinogens including Benzo(a)pyrene" (an IARC Class 1 carcinogen). (R.R. at 39a.) However, Dr. LeMasters only discussed how the mechanisms of endocrine disrupters and PAHs may affect the prostate and did not provide any evidence that they actually cause prostate cancer.

Dr. LeMasters also opined that there are other Group 1 carcinogens that firefighters are plausibly exposed to, including: arsenic, cadmium, formaldehyde, vinyl chloride, benzene and diesel exhaust. She did not mention how these carcinogens are specifically shown to cause prostate cancer.

In the conclusion of her report, Dr. LeMasters acknowledged that firefighters are exposed to a "soup" of cancer-causing agents with unknown

_____

[7] According to Dr. LeMasters' report, a "biologic plausibility" is when "unusually intense circumstances of exposure to some chemical [are] identified as **plausibly linked** to prostate cancer." (R.R. at 36a) (emphasis added).

18

interactions and, consistent with the language of her report, opined that "prostate cancer is **related to** fire service exposures" and that there is a "biologic plausibility of the **association** between firefighter exposures and . . . prostate cancer," (R.R. at 43a) (emphasis added).  She then concluded that, within a reasonable degree of medical certainty, "firefighter exposures are, at a minimum, a significant contributing factor in the development of prostate cancer." (*Id.*)  However, there was no indication as to what, exactly, those exposures were or what exposures were actually demonstrated to cause prostate cancer.

**6.**

Finally, in another report dated December 1, 2012, Dr. Guidotti addressed Dr. LeMasters' assertions and criticisms, retorting, in relevant part:

> Of course some chemicals cause cancer – we all know that.  Furthermore, that many chemicals associated with exposure in the course of firefighting are carcinogenic is also not at issue. . . .  The issue is what relevance this has for prostate cancer, a cancer that has few strong associations other than family history, especially when lifetime risk into advance age is taken into account.
>
> * * *
>
> It is well established that firefighters are *exposed* to [PAHs] . . . not so well established for phthalates . . . but it is not established that these exposures *cause* or at least *confer a sufficient elevated risk* for prostate cancer.
>
> * * *
>
> As I made clear in my original report, I do not take issue with the evaluation of individual cases on their merits.  Such cases would most likely have certain characteristics, including relatively younger age and

19

possibly unusually intense exposure history, in keeping with some other cancers documented to be associated with chemical exposures and occupation.

However, a prostate cancer identified in an older man is unlikely to have arisen from occupation regardless of firefighting history, because the odds of a man getting it during his lifetime are one in six already (as noted by Dr. LeMasters) and firefighting does not seem to change this substantially.

(R.R. at 1807a-1810a) (emphasis in original).

## III.

On August 31, 2016, the WCJ denied Claimant's claim petition, concluding that Claimant failed to prove that his prostate cancer was causally related to his service as a firefighter and that he has been diagnosed with a type of cancer caused by a Group 1 carcinogen. Here, the WCJ accepted Claimant's testimony as to his history with the fire department and experience with cancer, but found it not relevant to the issue of medical causation.

Regarding the medical evidence, the WCJ found "the testimony of Dr. Guidotti to be more credible and persuasive than that of Dr. Singer." (WCJ's Decision at 16.) In addition to specifying eight reasons for crediting Dr. Guidotti over Dr. Singer,[8] the WCJ noted that:

---

[8] In essence, the WCJ offered the following reasons for that credibility determination: (1) Dr. Singer was not Claimant's physician and never examined him; (2) Dr. Singer wrote virtually identical reports for the other claimant-firefighters represented by Claimant's counsel; (3) Dr. Singer's practice does not involve prostate cancer and, unlike Dr. Guidotti, he is not a toxicologist or epidemiologist and has no research or publications on the etiology of prostate **(Footnote continued on next page…)**

20

[W]hile Dr. Singer opined that firefighters are exposed to various carcinogens such as diesel fumes, smoke, soot, partially burned plastics and wood, PAHs, [polychlorinated biphenyl], arsenic, benzene, [phth]alates, and other Group 1 and Group 2A IARC carcinogens, **and that prostate cancer is "related" to the Group 1 carcinogens arsenic, cadmium, polycyclic aromatic hydrocarbons (PAHs) like benzo(a)pyrene, and dioxin, he did not testify that prostate cancer is caused by a particular Group 1 carcinogen** but merely that the firefighters' exposure to carcinogens was a contributing factor to the cases of prostate cancer he reviewed and that Claimant's exposure to carcinogens while working for [Employer] was a substantial contributing factor in the development of his cancer.

(WCJ's Decision at 17) (emphasis added). Accordingly, even though Dr. Guidotti did not offer an opinion as to the specific cause of Claimant's prostate cancer, the WCJ nonetheless found his testimony sufficiently convincing that Dr. Singer's evaluation was deficient and that Claimant's prostate cancer was not caused by firefighter exposures.

The WCJ concluded:

---

**(continued…)**

cancer; (4) Dr. Singer is not familiar with a multitude of other methodologies that could be used for proving a causal relationship between a given agent and a particular cancer, and he could not cite authority for using the differential diagnosis methodology; (5) Dr. Singer had no specific information on exposures in any of the firefighter cases reviewed and relied on the firefighters' self-reported histories; (6) Dr. Singer did not consider the dose-response relationship between a given agent and a given disease; (7) Dr. Singer did not thoroughly consider other factors that might be relevant to the causation issue, such as race, diet, alcohol consumption, and possible military exposure to carcinogens; and (8) the main risk factor for prostate cancer is age, and Claimant was 50 years old when he was diagnosed.

Even had he made his claim within 300 weeks, pursuant to the Commonwealth Court's recent opinion in [*Sladek*], Claimant failed to prove that he is entitled to the presumption set forth in Section 301(e) because he did not show that prostate cancer is a hazard in the occupation of firefighting, or that he is entitled to the presumption in section 301(f) because he did not show that he has been diagnosed with a type of cancer "caused by exposure to a known carcinogen which is recognized as a Group 1 carcinogen" as required by Section 108(r). In other words, the presumption would not come into play until Claimant established that his cancer (prostate) is a type caused by Group 1 carcinogens, which Claimant did not do.

(WCJ's Determination at 19.)[9]

Claimant appealed and the Board affirmed, concluding that Claimant failed to demonstrate that his cancer is an occupational disease for firefighters under Section 108(r) of the Act and that his disease is a type of cancer caused by exposure to a recognized Group 1 carcinogen. This is because the WCJ, as factfinder, found the testimony of Dr. Guidotti more credible than that of Dr.

---

[9] In her conclusions of law, the WCJ determined that Claimant is not entitled to the presumption in Section 301(e) and (f) because Claimant filed his claim petition approximately 490 weeks after his last exposure. This is because "Claimant's last alleged exposure before his disability was necessarily before his November 11, 2002 surgery. He filed this Claim Petition on April 20, 2012, approximately 490 weeks later. Therefore, although permitted by Section 301(f) to make a claim within 600 weeks, he is not entitled to the presumption of that subsection, which applies only to claims made within 300 weeks of the last date of exposure." (WCJ's Decision at 19.) However, the WCJ did not rely on this conclusion because, regardless, Claimant failed to demonstrate that he was exposed to a Class 1 carcinogen that is shown to cause prostate cancer. Although we note that Claimant testified that his last exposure to a fire prior to retiring was in mid-July 2007, because of the manner that we dispose of this matter, we do not reach the issue.

Singer, and substantial evidence supported that determination.[10] Claimant then filed this petition for review.

## IV.

On appeal, Claimant does not challenge the WCJ's credibility determinations or the lack thereof. Instead, he contends that the WCJ and Board inappropriately shifted the burden onto Claimant to demonstrate that he was exposed to a Class 1 carcinogen that causes prostate cancer, and that, in any event, he established just that through uncontested and pertinent evidence that the WCJ ignored.

Regarding Claimant's assertion, his counsel is well aware that we have rejected identical arguments in a multitude of cases, including *Hutz*. In addition, in each of those cases, virtually the same exact record and WCJ credibility determinations have been before this Court for review.

Regarding Claimant's initial burden, in *Hutz*, we explained that a claimant seeking compensation for cancer under Section 108(r) must establish that "his disease is a type of cancer caused by exposure to a carcinogen recognized as a Group 1 carcinogen by the IARC." 147 A.3d at 53 (citing Section 108(r) of the

---

[10] The Board further noted that Claimant raised the issue that the WCJ failed to make credibility determinations for Dr. Weaver and Dr. LeMasters. The Board rejected that argument noting that the WCJ summarized their reports and indicated that she considered all of the evidence in rendering her opinion.

Act, 77 P.S. § 27.1(r)). Obviously, the WCJ and Board did not err in placing the burden on Claimant to do exactly that.

Regarding Claimant's latter claim, after a thorough review of the record, we conclude that the WCJ's findings are amply supported by the record and find no such unequivocal/uncontested evidence in the record demonstrating that Claimant was exposed to a particular IARC Class 1 carcinogen that has been shown to cause prostate cancer. While Claimant may believe that certain evidence, if accepted, supports a finding in his favor, that is not our standard of review. As we have explained:

> In workers' compensation cases, the WCJ is the ultimate fact-finder and has exclusive province over questions of credibility and evidentiary weight. *A&J Builders, Inc. v. Workers' Comp. Appeal Board (Verdi)*, 78 A.3d 1233 (Pa. Cmwlth. 2013). The WCJ may accept the testimony of any witness, including a medical witness, in whole or in part. *Id.* We are bound by the WCJ's credibility determinations. *Id.*
>
> Moreover, it is irrelevant whether the record contains evidence supporting findings other than those made by the WCJ; the crucial inquiry is whether the evidence supports the findings actually made. *Id.* Therefore, we must examine the entire record to see if it contains evidence a reasonable person might find sufficient to support the WCJ's findings. *Id.* If the record contains such evidence, the findings must be upheld, even though the record may contain conflicting evidence. *Id.* Additionally, we must view the evidence in the light most favorable to the prevailing party and give it the benefit of all inferences reasonably deduced from the evidence. *Wagner v. Workers' Comp. Appeal Board (Anthony Wagner Auto Repairs & Sales, Inc.)*, 45 A.3d 461 (Pa. Cmwlth.2012).

*Hutz*, 147 A.3d at 54. Obviously, as thoroughly outlined above, there is ample support for the WCJ's findings and credibility determinations.

Accordingly, for the foregoing reasons, we affirm the Board's order.

_____
DAN PELLEGRINI, Senior Judge

Judge Fizzano Cannon did not participate in this decision.

25

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Charles Sessions, : 
               Petitioner : 
            :
        v. : No. 1223 C.D. 2017
            :
Workers' Compensation Appeal : 
Board (City of Philadelphia), : 
             Respondent :

**O R D E R**

AND NOW, this 15th day of March, 2018, it is hereby ordered that the order of the Workers' Compensation Appeal Board in the above-captioned matter is affirmed.

_____
DAN PELLEGRINI, Senior Judge